# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DO NO HARM,

*Plaintiff,*

v.

No. 1:24-cv-1782

AMERICAN ASSOCIATION OF
UNIVERSITY WOMEN,

*Defendant.*

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF <u>TIME-SENSITIVE</u> MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction ...................................................................................................................1

Background....................................................................................................................2

    I.     AAUW operates a race-based fellowship...........................................................2

    II.    AAUW's fellowship involves a contract. ...........................................................7

    III.   AAUW's discrimination harms Do No Harm's members. ............................7

Argument .....................................................................................................................14

    I.     AAUW's Selected Professions Fellowships program likely violates
          section 1981. ...............................................................................................14

    II.    Absent relief, Do No Harm's members will suffer irreparable harm. ..........19

    III.   The balance of equities and public interest favor granting relief. ................21

Conclusion..................................................................................................................23

## INTRODUCTION

"Racial discrimination is invidious in all contexts." *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). Healthcare especially. Yet, through its Selected Professions Fellowships (for the Focus Professions Group), AAUW is contracting only with certain racial groups. Medical students who are white—like Do No Harm's Members A and B—are not eligible.

> **Focus Professions Group Fellowships**
>
> Open only to women from ethnic minority groups historically underrepresented in certain fields within the United States: Black or African American, Hispanic or Latino/a, American Indian or Alaska Native, Asian, and Native Hawaiian or Other Pacific Islander.

Racial discrimination has been unlawful in private contracting since at least 1866, when Congress passed 42 U.S.C. §1981. Section 1981 "protects the equal right of all persons … to make and enforce contracts without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up). Because AAUW "regards" the Selected Professions Fellowships to be a "contract" and requires the Fellows to "sign a contract as acceptance of the award," AAUW is violating §1981 when it discriminates based on race. VC (Doc. 1) ¶3. In recent weeks, the Eleventh Circuit preliminarily enjoined a similar race-based program under §1981. *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024). Do No Harm is entitled to the same relief.

But time is of the essence. AAUW will open the application cycle on August 1, 2024, and close it on November 30, 2024. VC ¶19. Once the application window is closed, AAUW will choose the winners, and Members A and B will lose their chance to compete during this application cycle. And because Member B will graduate in 2026, she could forever lose her chance to compete for a spot. All because of skin color.

To preserve the status quo, Do No Harm asks this Court, **by July 31, 2024**, to enter preliminarily enjoin AAUW from closing the application process, awarding the Selecting Professions Fellowships for the Focus Professions Group, or otherwise operating this fellowship program as currently structured until further order of this Court. If more time is needed, this Court should also enter a TRO barring AAUW from opening the application process until this Court rules on the preliminary-injunction motion.

## BACKGROUND

AAUW runs the Selected Professions Fellowships program, which funds the education of women who are pursuing degrees in business, law, and medicine. But AAUW requires applicants to be "women of color" and excludes white applicants. Do No Harm has white members who are currently in medical school, who want to apply, but who are currently ineligible because of their race.

### I.   AAUW operates a race-based fellowship.

AAUW operates the Selected Professions Fellowships. VC ¶11; AAUW, *Selected Professions Fellowships* (last visited June 20, 2024), perma.cc/5B2D-FHU2 (Ex. A). Each year, AAUW awards $20,000 to women who pursue master's or other professional

degrees so they can pursue their education. VC ¶11. These funds can be used to pay for educational expenses, living expenses, childcare, and travel to professional meetings, conferences, or seminars. VC ¶11. According to AAUW, the Selected Professions Fellowships are awarded to women who intend to pursue a full-time course of study in concentrations where "women's participation traditionally has been low." VC ¶12.

AAUW categorizes these concentrations into two groups—"Science and Technology Group" and "Focus Professions Group." VC ¶12. The Science and Technology Group is awarded to women who pursue master's programs in architecture, computer/information sciences, engineering, and math. VC ¶13. The Science and Technology Group are facially open to all women regardless of their race. VC ¶13. The Focus Professions Group is awarded to women who pursue degrees in business administration (MBA), law (JD), or medicine (MD or DO). VC ¶14.

The objective criteria for the Focus Professions Group are few. To be eligible, applicants must be a U.S. citizen or permanent resident, have achieved high standards of academic excellence, and show promise of distinction in their fields. VC ¶15. They must also be a full-time student at an accredited U.S. institution. VC ¶15. The Selected Professions Fellowships are not open to previous recipients of any other AAUW national fellowship or grant. VC ¶16. And the Fellowships only support full-time coursework in the fields designated by AAUW, so an individual enrolled in a joint-degree program may not use the Fellowship funds to support coursework in other fields, even if part of a joint-degree program. VC ¶16. AAUW also will not provide funding for

3

distance-learning programs, programs that heavily depend on distance learning, Ph.D. coursework or dissertations. VC ¶16.

Eligible applicants are then judged under several subjective criteria. A selection panel meets once a year to review the applications. VC ¶17. Awards are then based on the criteria that AAUW publishes on its website and made "on a competitive basis according to funds available in a given fiscal year." VC ¶17. AAUW has listed the following review criteria:

- Demonstrated commitment to education and equity for women and girls.

- Reason for seeking higher education.

- Degree to which study plan is consistent with career objectives.

- Potential as a practicing professional and potential as a role model in new and innovative or nontraditional fields of study, research or practice.

- Intent to contribute (through chosen profession) to societal well-being and commitment to the advancement of women and girls.

- Documentation of opportunities in chosen field.

- Feasibility of study plans and proposed time schedule.

- Validity of proposed budget and budget narrative, including sufficient outside support.

- Quality of written proposal.

- Academic excellence and related academic success indicators.

- **Applicant is from an underrepresented racial/ethnic background.**

4

- Financial need.

- Priority is given to women who do not already hold a master's or first professional degree.

- Special consideration will be given to applicants who demonstrate their intent to enter professional practice in disciplines in which women are underrepresented, and/or their intent to serve under-resourced populations and communities, to pursue public interest areas, or who are nontraditional students.

VC ¶18 (emphasis added).

The application cycle for the Selected Professions Fellowships opens on August 1 every year and ends on November 30. VC ¶19. The next available fellowship year will run from July 2025 to June 2026. VC ¶20.

Fellowships for the Focus Professions Group, however, are "[o]nly open to women from ethnic minority groups" whom AAUW considers "historically underrepresented." VC ¶21. These groups are: "Black or African American, Hispanic or Latino/a, American Indian or Alaskan Native, Asian, and Native Hawaiian or Other Pacific Islander." VC ¶21. White women are not included. VC ¶22. They are ineligible. VC ¶22. In fact, AAUW admits that the Selected Professions Fellowships for the Focus Professions Group are "restricted to women of color who have been underrepresented in th[o]se fields." VC ¶23.

AAUW's current strategic plan confirms that AAUW seeks to "embody the goals and spirit of equity, inclusion, diversity[,] and intersectionality across all AAUW activities and participants." VC ¶24 (quoting AAUW, *Strategic Plan 2.0* (last visited June 20,

2024), perma.cc/NC8B-C9L9 (Ex. B)). AAUW's strategic plan further confirms that its "diversity" goal means "prioritizing women of color." VC ¶24 (quoting *Strategic Plan 2.0*, supra).

Consistent with this goal, AAUW advertises that the Selected Professions Fellowships for the Focus Professions Group are open only to women of color. VC ¶25. For instance, in an article explaining how women can "fin[d] graduate funding opportunities," AAUW confirmed that the Selected Professions Fellowships were "offered to women of color." VC ¶26; AAUW, *Navigating Graduate Funding Opportunities* (last visited June 20, 2024), perma.cc/V7Z9-SB2V (Ex. C). AAUW has also posted on Facebook, "Are you a woman of color pursuing a Masters in a male-dominated field? We want to fund you!" VC ¶28; AAUW Facebook Posts, at 2 (Ex. D). On other occasions, it stated that "Women of Color pursuing a JD, MBA, or MD" should apply to the Selected Professions Fellowships, VC ¶29; Ex. D, at 3, and that "[s]pecial funds [were] available for women of color pursuing a law degree, medical degree, or MBA," VC ¶30; Ex. D, at 4. AAUW has also made clear that the Selected Professions Fellowships are "for women of color." VC ¶¶27, 28, 31; Ex. D, at 5.

Because white women aren't "women of color," aren't "underrepresented" according to AAUW, and aren't included in the list of races for whom the Selected Profession Fellowships are open, they are flatly excluded from applying. VC ¶32. At a minimum, AAUW prefers applicants who are nonwhite to applicants who are white, based on their race. VC ¶32.

## II.    AAUW's fellowship involves a contract.

AAUW makes it clear that it intends to form a contract with the Fellowship recipient if she is accepted. VC ¶33. AAUW "regards the acceptance of a fellowship as a contract requiring the fulfillment of the following terms." VC ¶34.

All Selected Professions Fellows agree to "sign a contract as acceptance of the award." VC ¶35. The instructions on AAUW's website "will become part of the fellowship contract." VC ¶35. Fellows agree, among other things, to "pursue a full-time course of study during the fellowship year." VC ¶36. Fellows further agree to seek "prior written approval of AAUW" before making any changes to their study plans for the fellowship year. VC ¶37. In exchange for these promises, AAUW agrees to pay the Fellows $20,000 directly (not to their schools). VC ¶38.

The application process for the Selected Professions Fellowships is also a contest that turns on the "quality of written proposal." VC ¶39. Each year, AAUW awards the Fellowships "on a competitive basis according to funds available" based on a review by panels chosen by AAUW (and final approval by AAUW). VC ¶39. For the award year 2022-2023, AAUW awarded 26 women with Selected Professions Fellowships. VC ¶40.

## III.    AAUW's discrimination harms Do No Harm's members.

Do No Harm has at least two members—Members A and B—who are being harmed by AAUW's Selected Professions Fellowships. VC ¶41; Rasmussen Decl. ¶4.

Members A and B meet all the nonracial eligibility criteria for the Selected Professions Fellowships (specifically, the Focus Professions Group). VC ¶43; A Decl. ¶3;

B Decl. ¶3. Both are women and U.S. citizens. VC ¶44; A Decl. ¶4; B Decl. ¶4. Both are currently enrolled as full-time students at accredited schools in the United States and pursuing a doctorate degree in osteopathic medicine. VC ¶44; A Decl. ¶5; B Decl. ¶5. Member A recently completed her first year and will begin her second year in the fall. VC ¶44; A Decl. ¶5. Member B recently completed her second year and is going into her third year this fall. VC ¶44; B Decl. ¶5.

For both Members A and B, the D.O. degree would be their first master's or professional degree. VC ¶45; A Decl. ¶15; B Decl. ¶17. Both Members can and would obtain a letter of recommendation from professors at their schools under whom they recently studied. VC ¶45; A Decl. ¶16; B Decl. ¶18. As students in good standing, both can and would ask the deans of their schools to write them a letter of recommendation. VC ¶45; A Decl. ¶16; B Decl. ¶18. Neither is pursuing a joint-degree program or a Ph.D. VC ¶46; A Decl. ¶6; B Decl. ¶6. Their D.O. programs are in person. VC ¶46; A Decl. ¶6; B Decl. ¶6. And neither has ever received any AAUW national fellowship or grant. VC ¶46; A Decl. ¶7; B Decl. ¶7. Members A and B desire and would benefit greatly from the vast professional network offered by AAUW to its Fellows. VC ¶47; A Decl. ¶8; B Decl. ¶8.

Both Members A and B are strong candidates for receiving a Selected Professions Fellowship. Member A grew up in a rural area. VC ¶47; A Decl. ¶9. When she was growing up, the women around her were mostly stay-at-home moms. VC ¶48; A Decl. ¶9. There weren't any women in her life who worked professionally, like

8

doctors or lawyers. VC ¶48; A Decl. ¶9. Member A married and started a family when she was young. VC ¶48; A Decl. ¶9. For that reason, though she had started attending college, she did not get her bachelor's degree until much later after her kids got older. VC ¶48; A Decl. ¶9. Member A was a teacher for four years in a rural part of the country. VC ¶48; A Decl. ¶9. She decided to go to medical school for two primary reasons. VC ¶49; A Decl. ¶9. She always loved learning about the human body. And she wanted to help people. VC ¶49; A Decl. ¶9.

Member A has a demonstrated commitment to education and equity for women and girls. VC ¶50; A Decl. ¶10. She is passionate about encouraging women to challenge themselves to reach as far as they can. VC ¶50; A Decl. ¶10. Member A had to overcome a background with no professional women role models. VC ¶50; A Decl. ¶10. Member A would admit that she had little drive to study in her early years. VC ¶50; A Decl. ¶10. But she soon discovered a passion for learning. VC ¶50; A Decl. ¶10. Member A completed over 250 undergraduate credits. VC ¶50; A Decl. ¶10. She is passionate about showing other women that they can pursue both family and professional life. VC ¶50; A Decl. ¶10. She has also encouraged her daughters to take challenging classes, prioritize their education, and explore all fields, including traditionally male-dominated professions like medicine. VC ¶50; A Decl. ¶10. The same goes for her female students, many of whom had parents who worked in blue-collar jobs and could use encouragement to see the value in education. VC ¶50; A Decl. ¶10. Member A

always encouraged them to aim high, including by teaching them how to be competitive for scholarships. VC ¶50; A Decl. ¶10.

Member A wants to keep serving as a role model to others and mentoring them. Currently, Member A is active in her church and helps teach younger children. VC ¶51; A Decl. ¶11. And later, when she has the opportunity, she wants to find a way to educate students about the harmful effects of drugs. VC ¶51; A Decl. ¶11. Member A knows how to talk to them given her background as a teacher, and she's passionate about teaching them about health and making good choices. VC ¶51; A Decl. ¶11. Once she becomes a doctor, Member A wants to practice medicine in rural communities. VC ¶52; A Decl. ¶12. Member A has a heart for those communities because she grew up in one of them. VC ¶52; A Decl. ¶12. Member A wants to help those communities because they experience significant unmet healthcare needs. VC ¶52; A Decl. ¶12.

Member A's study plan is consistent with her career objectives. VC ¶53; A Decl. ¶13. The D.O. program sets out the path that she must follow to become a doctor. VC ¶53; A Decl. ¶13. Having completed the first year, Member A's focus is now on doing well during her second year and preparing for her board exams. VC ¶53; A Decl. ¶13. Member A wants to score high on the board exams so she can increase the chances of getting into a good residency program. VC ¶53; A Decl. ¶13. Member A is on track to graduate in 2027. VC ¶53; A Decl. ¶13.

Member A has demonstrated financial need. VC ¶54; A Decl. ¶14. She grew up poor. VC ¶54; A Decl. ¶14. And although her husband currently works full time,

Member A's family has modest means and must take care of their children. VC ¶54; A Decl. ¶54. She has obtained a need-based scholarship from her school, but that's still not enough to cover everything. VC ¶54; A Decl. ¶14. Member A is currently covering the remainder of her tuition and living expenses with student loans. VC ¶54; A Decl. ¶14. She would use the $20,000 from the fellowship to pay tuition. VC ¶54; A Decl. ¶14.

Member B grew up in the Midwest and obtained her bachelor's degree from a public university. VC ¶55; B Decl. ¶9. Member B decided to go to medical school after doing a summer internship in Kenya. VC ¶55; B Decl. ¶9. There, she got to work with medical providers who cared for women. VC ¶55; B Decl. ¶9. It was an eye-opening experience. VC ¶55; B Decl. ¶9. Because Kenya lacks many high-quality doctors or trained medical professionals, women there experience a high rate of miscarriages. VC ¶55; B Decl. ¶9. In addition, Member B got to work with women who were victims of sexual assault, some of whom became pregnant. VC ¶55; B Decl. ¶9. This internship solidified her desire to go to medical school and obtain the level of training that she would need to serve vulnerable women. VC ¶55; B Decl. ¶9. Member B wants to become an obstetrician-gynecologist. VC ¶56; B Decl. ¶10. She is passionate about helping young pregnant women, teaching women about health, and empowering mothers to teach their daughters about health. VC ¶56; B Decl. ¶10. Member B also wants to serve women in rural and underserved communities. VC ¶56; B Decl. ¶10.

Member B is always looking for ways to help others by educating them about health. She currently volunteers at a food pantry. VC ¶57; B Decl. ¶11. One of her current projects involves coordinating with a pediatrician to increase healthier meal options at the pantry and to develop healthy recipes for families to use. VC ¶57; B Decl. ¶11. Member B wants to teach people about the value of taking care of their health to avoid medical interventions later. VC ¶57; B Decl. ¶11.

Member B is involved in various activities where she mentors others. VC ¶58; B Decl. ¶12. Member B is on the leadership team for various student organizations, including as the vice president for a medical-missions organization at her school, where she is responsible for organizing community outreach and service projects. VC ¶58; B Decl. ¶12. She is also a student ambassador for her school, so she frequently interacts with future applicants and students about what it's like to be a medical student. VC ¶58; B Decl. ¶12. And Member B often gives advice to undergraduates who have questions about medical school. VC ¶58; B Decl. ¶12.

Member B has always challenged herself to do well academically. VC ¶59; B Decl. ¶13. In college, Member B graduated magna cum laude, was on the dean's list almost every semester, and received the dean's distinguished award. VC ¶59; B Decl. ¶13. Currently, she is on track to graduate medical school in 2026. VC ¶59; B Decl. ¶13. Doing well in school and on the board exams is especially important to Member B because it will increase her chance of matching with an OB-GYN residency. VC ¶59; B Decl. ¶13.

Member B's study plan is consistent with her career objectives. The D.O. program sets out the path that she must follow to become a doctor. VC ¶60; B Decl. ¶14. Member B would use the $20,000 to help pay tuition. VC ¶61; B Decl. ¶15. Member B is currently paying for tuition with student loans. VC ¶61; B Decl. ¶15. She has been covering her living expenses with the money that she saved while working during the gap year she took between college and medical school. VC ¶61; B Decl. ¶15. During her gap year, Member B often worked 80-hour work weeks to save as much as she could. VC ¶61; B Decl. ¶15. It's important for her to minimize the student loans because she wants to serve others without the stress of debt or worrying about how much she will get paid. VC ¶61; B Decl. ¶15. Member B will soon need to start taking out student loans to cover living expenses too. VC ¶61; B Decl. ¶15.

In the past, Member B has sought out other similar scholarship and grant opportunities. VC ¶62; B Decl. ¶16. When she was in college, Member B received academic and athletic scholarships. VC ¶62; B Decl. ¶16. She also received a grant to research organic chemistry under the supervision of a professor. VC ¶62; B Decl. ¶16.

If Members A and B are accepted to the Selected Professions Fellowship, they are prepared to meet the program's requirements and expectations. VC ¶63; A Decl. ¶17; B Decl. ¶19. Though they meet all the nonracial eligibility requirements, they are not eligible to apply because they are white and do not identify as any other ethnicity. VC ¶64; A Decl. ¶18; B Decl. ¶20. If they applied today, their applications would be rejected for not meeting the racial requirement or would be heavily

disadvantaged. VC ¶64. They find it hurtful, unfair, and offensive that their skin color, which they can't control, would be considered by AAUW in any way. VC ¶64; A Decl. ¶18; B Decl. ¶20.

Members A and B are ready and able to apply to the fellowship's next available application cycle program if a court orders AAUW to stop discriminating against white applicants. VC ¶65; A Decl. ¶19; B Decl. ¶21. Both plan to apply if a court grants that relief. VC ¶65; A Decl. ¶19; B Decl. ¶21.

## ARGUMENT

Do No Harm is entitled to interim relief if it can satisfy four factors: a likelihood of success on the merits, a substantial threat of irreparable harm, the balance of equities, and the public interest. *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016). Do No Harm satisfies all four.

## I.   AAUW's Selected Professions Fellowships program likely violates section 1981.

Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). Section 1981 covers private parties, like AAUW. 42 U.S.C. §1981(c). Its "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's*, 546 U.S. at 474 (cleaned up). In other words, §1981 "forbids

14

racial discrimination in the making and enforcement of private contracts … whether the aggrieved party is black or white." *Bobo v. ITT, Cont'l Baking Co.*, 662 F.2d 340, 342 (5th Cir. 1981).

Section 1981 prohibits racial discrimination in "all phases and incidents of the contractual relationship." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 302 (1994). Because §1981 protects "the making … of contracts," §1983(b), a contract "need not already exist," *Domino's*, 546 U.S. at 476. The statute "protects the would-be contractor along with those who have already made contracts." *Id.* It "offers relief when racial discrimination blocks the creation of a contractual relationship." *Id.*

Here, AAUW is violating §1981 by intentionally excluding certain applicants from contractual relationships because of their race. The program involves a contract, discriminates on its face, makes white applicants unable to compete on an equal footing, and flunks the applicable level of scrutiny.

**1.** AAUW's Selected Professions Fellowships implicate the right to "make … contracts." §1981(a). AAUW's Selected Professions Fellowships form a contract in two ways. To start, AAUW says that it "regards the acceptance of a fellowship as a contract." VC ¶34; Ex. A, at 8. And AAUW requires all Selected Professions Fellows to "sign a contract as acceptance of the award." VC ¶35; Ex. A, at 8. In no uncertain terms, AAUW seeks to "make … contracts" with the Fellows. §1981(a). These confessions should be the end of the analysis. *See Fearless Fund*, 103 F.4th at 775 (a defendant "faces an uphill battle" in avoiding §1981 when it tells others it wants to form "a contract").

If more analysis were needed, consider the terms that Fellows must "fulfil[l]" in exchange for becoming a Fellow. VC ¶34; Ex. A, at 8. "The term contract, as used in §1981, refers to a right in the promisee against the promisor, with a correlative special duty in the promisor to the promisee of rendering the performance promised." *Adams v. McDougal*, 695 F.2d 104, 108 (5th Cir. 1983) (cleaned up). Stated differently, a contract is "'an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration.'" *Fearless Fund*, 103 F.4th at 775 (quoting 17A Am. Jur. 2d Contracts §1). Here, in exchange for $20,000, the ability to call oneself an AAUW Follow, and joining a vast professional network, the Fellows must agree to pursue a full-time course of study during the fellowship year and to give AAUW a contractual right to regulate their coursework. VC ¶¶36-37; Ex. A, at 8-9. "By any measure, that is a bargained-for exchange supported by good and sufficient consideration." *Fearless Fund*, 103 F.4th at 775.

AAUW's Selected Professions Fellowships also involve a contract because the selection process amounts to a contest. AAUW judges applications "on a competitive basis" based on the "criteria outlined" on its website. VC ¶39; Ex. A, at 6-7. For the award year 2022-2023, AAUW awarded only 26 women a fellowship. VC ¶40. This process of "select[ing]" winners based on "merit" is a "bona fide contest." *Brooklyn Daily Eagle v. Voorhies*, 181 F. 579, 582-83 (C.C.E.D.N.Y. 1910); *accord Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994) ("answering an essay question" is "a contest"). And a "contest is a common example of a unilateral contract." *Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL1313108, at *4 (E.D. Pa. Apr. 8).

"'[P]ayment of a prize to a winner of a contest is the discharge of a contractual obligation.'" *Glasgow v. Sherwin-Williams Co.*, 901 F. Supp. 1185, 1194 (N.D. Miss. 1995). "'The acceptance by the contestants of the offer tendered by the sponsor of the contest creates an enforceable contract.'" *Id.*; *accord United States v. Chandler*, 376 F.3d 1303, 1308-12 (11th Cir. 2004) (observing the "well-settled rule" that a contest is "an offer for a unilateral contract that can be accepted by performing all the terms and conditions"). "[N]early all jurisdictions have adopted the rule that contract law governs the sponsor-contestant relationship." *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1104 (10th Cir. 2001) (cleaned up). For these reasons, AAUW's Selected Professions Fellowships implicate the right to "make … contracts." §1981(a).

**2.** AAUW is violating §1981 by intentionally limiting the formation of contractual relationships based on race. White applicants are not eligible to apply. VC ¶¶22, 32; Ex. A, at 3-4. At a minimum, AAUW considers whether applicants are nonwhite and thus uses race as a factor. VC ¶32; Ex. A, at 3-4, 7. This policy is "discriminatory on its face," which supplies "direct evidence" of discriminatory intent. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). AAUW has also "express[ed] desire to avoid" contracting with members of a certain race. *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). AAUW has repeatedly stated that the Selected Professions Fellowships are *for* women of color, and *only* women of color. VC ¶¶32-31; Ex. A, at 3-4; Ex. D, at 2-5; *see also* Ex. B, at 6. So Do No Harm "is not required to make any further

allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

**3.** Race is also a but-for cause for Member A's and Member B's "'loss of a legally protected right'" to make contracts. *Newman v. Amazon.com, Inc.*, 2022 WL 971297, at *7 (D.D.C. Mar. 31). "So long as the plaintiff's [race] was one but-for cause of that decision, that is enough." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). But for Member A-B's whiteness, they would have the "same right" to apply for the Selected Professions Fellowships and to "make … contracts" with AAUW. §1981(a). Because Member A and Member B are white, however, they are ineligible to apply or at least heavily disadvantaged if they were to apply. VC ¶64; Ex. A, at 3-4, 7.

It's no answer to say that AAUW also excludes minority *men* from the Selected Professions Fellowships. Between a white woman and a minority woman, AAUW excludes the former because of race. *See Connecticut v. Teal*, 457 U.S. 440, 455-56 (1982). Civil rights laws protect "*individual*" people. *Id.* at 455. And because race is "one but-for cause" of her exclusion, "that is enough." *Bostock*, 590 U.S. at 656.

**4.** AAUW's discrimination cannot survive strict scrutiny. *See Gratz v. Bollinger*, 539 U.S. 244, 275-76 & n.23 (2003); *Harvard*, 600 U.S. at 213. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995). Strict scrutiny is a "searching examination," and AAUW "bears the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fischer v. UT at Austin*, 570 U.S. 297, 310 (2013)

(cleaned up). "[T]o withstand strict scrutiny," AAUW's use of race must serve a "'compelling'" interest and be "'narrowly tailored'" to further that interest. *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 21 (D.C. Cir. 2001). AAUW cannot carry this heavy burden. There is no compelling interest that justifies a strict racial bar. And a categorical exclusion of an entire racial group is, by definition, not narrowly tailored under *any* standard. *See Fearless Fund*, 103 F.4th at 776 & n.5; *Hammon v. Barry*, 826 F.2d 73, 81 (D.C. Cir. 1987).

For all these reasons, AAUW is violating §1981.

## II. Absent relief, Do No Harm's members will suffer irreparable harm.

Do No Harm and its members will suffer irreparable harm without interim relief. Three harms are most acute.

**1.** Do No Harm's members are "'[v]ictims of discrimination'" and thus "'suffer irreparable injury, regardless of pecuniary damage.'" *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984); *accord Coal. for Equity & Excellence in Md. Higher Educ. v. Md. Higher Educ. Comm'n*, 295 F. Supp. 3d 540, 557-58 (D. Md. 2017) (irreparable injury "'comes from the maintenance of segregative policies'"). Race discrimination is "'invidious.'" *Harvard*, 600 U.S. at 214. Whether it's done by the government or private actors, it "'demeans the dignity and worth of a person to be judged by ancestry instead of by [her] own merit and essential qualities.'" *Id.* at 220. Unsurprisingly, in another case involving a §1981 challenge to a race-based grant program, the Eleventh Circuit held

that race discrimination in contracting is "'essentially irremediable'" and inflicts "irreparable injury." *Fearless Fund*, 103 F.4th at 780.

**2.** Do No Harm's members cannot compete on an equal footing. "The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on equal footing." *Adarand*, 515 U.S. at 211 (cleaned up); *see also Parents Involved in Cmty. Schs v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 719 (2007) ("being forced to compete in a race-based system that may prejudice the plaintiff"). This harm "result[s] from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Ne. Fla. Chapter of Assoc Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993). AAUW prevents them "from competing at all" by deeming them ineligible based on race. *Fearless Fund*, 103 F.4th at 780. "[M]onetary damages are inadequate to ensure that" Do No Harm's members can "compete … on a level (and legal) playing field" for the current application cycle. *Planned Parenthood of N.Y.C. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018); *accord Bonnette v. D.C. Court of Appeals*, 796 F. Supp. 2d 164, 187 (D.D.C. 2011) ("forcing Plaintiff to take the MBE under discriminatory conditions is itself a form of irreparable injury.").

**3.** Do No Harm's members risk losing valuable opportunities. "[L]ost opportunities" are irreparable because they are "difficult, if not impossible, to quantify" with damages. *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005). "The loss of specific job opportunities, training[,] and competitive advantages can constitute irreparable harm." *Tanner v. Fed. Bureau of Prisons*, 433 F. Supp. 2d 117, 125 (D.D.C.

2006). "These sorts of injuries, *i.e.*, deprivations of temporally isolated opportunities, are exactly" the type of injuries "[t]hat preliminary injunctions are intended to relieve." *D.M. v. Minn. State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019). Especially when the "loss of opportunity" is "due to alleged discrimination." *Giri v. NBME*, 2024 WL 756604, at *9 (D.D.C. Feb. 23). Hence why, in a similar case, the Eleventh Circuit held that the loss of "$20,000 cash prize," "ongoing mentorship," and "ensuing business opportunities" constituted irreparable harm. *Fearless Fund*, 103 F.4th at 780.

AAUW's discrimination inflicts the same irreparable injury. Here, AAUW promises not only $20,000 but also mentorship, professional, and networking opportunities for Fellows. VC ¶47. Absent an injunction, AAUW will open its application window on August 1 and close it on November 30, select the Fellows, and leave Members A and B without an opportunity to apply for this cycle. VC ¶19; Ex. A, at 2. For B, who will graduate from medical school in 2026, she could forever lose the opportunity to apply. VC ¶59; *see League of Women Voters*, 838 F.3d at 9. And these injuries remain irreparable even if Member A, who will graduate in 2027, could apply again. *See, e.g.*, *D.M.*, 917 F.3d at 1003 (inability to compete for the high-school dance team as a junior is irreparable because the plaintiffs "cannot get that season back"); *Yang v. Kosinski*, 960 F.3d 119, 128 (2d Cir. 2020) (the inability to "compete" in an upcoming primary is irreparable).

## III.   The balance of equities and public interest favor granting relief.

The balance of harms favors Do No Harm. As explained, the harms here are substantial and irreparable: the harm of racial discrimination, the inability to compete

on an equal footing, and the potential permanent loss of valuable opportunities.

AAUW, however, faces only minor burdens. True, an injunction will make AAUW "change" the eligibility criteria "to bring itself into compliance with §1981." *Fearless Fund*, 103 F.4th at 780. But this minor administrative burden "pales in comparison to the interest in rooting out race discrimination in all its forms." *Id.* Nor is AAUW meaningfully harmed if it must delay when it selects Fellows. This delay will "not substantially injure" AAUW. *League of Women Voters*, 868 F.3d at 12. Courts have recognized that a mere delay imposes little, if any, harm, especially where the deadline was "arbitrarily set in the first place." *GOS Operator, LLC v. Sebelius*, 2012 WL 175056, at *5 (S.D. Ala. Jan. 20). And AAUW brought any harm upon itself by adopting a racially discriminatory program. *See Kos Pharms., Inc. v. Andryx Corp.*, 369 F.3d 700, 728 (3d Cir. 2004). The balance of the harms favors an injunction. *See Fearless Fund*, 103 F.4th at 780

The public interest also favors Do No Harm. "[C]ivil rights actions vindicate a public interest." *Villano v. City of Boynton Beach*, 254 F.3d 1302, 1306 (11th Cir. 2001) (citing *Williams v. Thomas*, 692 F.2d 1032, 1038 (5th Cir. 1982)). And "[i]t is in the public interest for courts to carry out the will of Congress." *Myland Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 45 (D.D.C. 2000). Especially where, as here, AAUW has engaged in "[r]acial discrimination," which "is invidious in all contexts." *Harvard*, 600 U.S. at 214 (cleaned up). The public interest is "well served" by vindicating §1981's terms and ensuring racial equality in contracting. *Fearless Fund*, 103 F.4th at 780.

Finally, because Do No Harm is "engaged in public-interest litigation, an area in which the courts have recognized an exception to the Rule 65 security requirement," this Court should not require a bond. *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1084 (5th Cir. 1981); *BellSouth Telecomms., Inc. v. MCI Metro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005).

## CONCLUSION

This Court should grant Do No Harm's motion.

Dated: June 20, 2024

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy (DC Bar #489651)
Cameron T. Norris (VA Bar #91524)
  *Lead Counsel*
Frank H. Chang (DC Bar #1686578)
C'Zar Bernstein (DC Bar #1736561)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
frank@consovoymccarthy.com
czar@consovoymccarthy.com

*Attorneys for Do No Harm*